**CONSOLIDATED UNDERWRITERS v. SAXON et al. (No. 459–3984.)**

(Commission of Appeals of Texas, Section B. Oct. 15, 1924.)

1. **Master and servant ⬅405(4)—Finding assaulted employee injured in course of employment sustained.**

Finding that employee, assaulted by another employee, was injured in course of employment, within Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp 1918, art. 5246—1 et seq.), held sustained by evidence.

2. **Master and servant ⬅386(4)—Poverty not only "special case" warranting lump sum payment of compensation.**

A "special case" warranting lump sum payment of compensation is not necessarily determinable by relative poverty of claimant, but thrift, intelligence, foresight, habit of frugality, capacity to manage and keep money, might well make out special case.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Special Case.]

3. **Master and servant ⬅405(6)—Evidence held to justify compensation in lump sum.**

Evidence held to justify award of compensation in lump sum on ground of necessity.

4. **Master and servant ⬅417(4) — District court authorized to decree lump sum compensation though not passed upon by Industrial Accident Board.**

District court was authorized to decree lump sum settlement under Workmen's Com-

pensation Act (Vernon's Ann. Civ. St. Supp. 1918, art 5246—1, et seq.), though such settlement had not been passed upon by Industrial Accident Board, the proceeding in all respects being a trial de novo.

**5. Master and servant** ⚖═386(4)—**Manner of computing lump sum award to dependent stated.**

Where Industrial Accident Board awarded $15 a week compensation for death of servant, and matter of lump sum payment was first raised in district court, dependent was not entitled to interest at rate of 6 per cent. on "present value" of total compensation from date of death to date of judgment of Court of Civil Appeals affirming judgment of district court fixing lump sum payment, but was entitled to 6 per cent. on each installment from time it fell due to date of judgment in district court, and 6 per cent. on payments and interest then due, plus "present value" of remaining installments to date of judgment in Court of Civil Appeals, under Workmen's Compensation Act, § 8 (Vernon's Ann. Civ. St. Supp. 1918, art. 5246—14).

Error to Court of Civil Appeals of Ninth Supreme Judicial District.

Suit by Consolidated Underwriters against Mrs. Ada Saxon and others to set aside an award of the Industrial Accident Board. From a judgment of the Court of Civil Appeals (250 S. W. 447), modifying and affirming the award for defendants, plaintiff brings error. Reversed and rendered.

C. A. Lord, of Beaumont, for plaintiff in error.

Feagin, German & Feagin, of Livingston, for defendants in error.

HAMILTON, J. This was a suit to set aside an award by the Industrial Accident Board of compensation to Mrs. Ada Saxon, Etha Perkins, her married dependent daughter, Floyd Saxon, Norman Saxon, Lois Saxon, and William Saxon, her minor children, for the death of W. L. Saxon, husband of Ada and father of the other defendants in error.

On April 4, 1921, W. L. Saxon was an employee of the Saner-Ragley Lumber Company at Carmona, Polk county, Tex., and, as such employee, was protected by an insurance policy issued by plaintiff in error. On that date he received wounds at the hands of Abe Johnson, another employee of the Saner-Ragley Lumber Company, from the effects of which he died.

Defendants in error were awarded compensation by the Industrial Accident Board in the sum of $15 per week for a period of 360 weeks, beginning on April 4, 1921, distributing one half to Mrs. Saxon and one half equally among the children. The plaintiff in error refused to pay the award and brought this suit to set it aside. Defendants filed a cross-action, praying for a lump sum settlement.

The trial court rendered judgment setting aside the award of the Industrial Accident Board, and decreeing that the defendants in error recover from the Consolidated Underwriters the sum of $5,400, together with interest thereon from the 4th day of April, 1921, and all costs of suit. There are other provisions of the judgment not important here. Plaintiff in error appealed. The Court of Civil Appeals modified the trial court's judgment. It discounted the $5,400 at the rate of 5 per cent., deriving a present value of $4,636.875. It then allowed interest at 6 per cent. on that amount from April 8, 1921, the date of the death of deceased, to February 8, 1923, the date of the court's judgment, during which time no payments had been made by the plaintiff in error. The interest allowed was $511, which the court added to the lump sum compensation, making a total of $5,148.875, for which it rendered judgment, with interest thereon from the date of that judgment. 250 S. W. 447. Consolidated Underwriters sought and obtained writ of error.

[1] It contends that Saxon did not receive the injuries, from which he died, "in the course of his employment, within the meaning of the Texas Compensation Law, and that therefore it is not liable." Both the trial court and the Court of Civil Appeals found that Saxon sustained the injuries from which he died in the course of his employment, and we think the finding is amply sustained by the evidence.

The testimony reveals that the Saner-Ragley Lumber Company owned a sawmill and also a railroad four to seven miles long used in connection with the sawmill. Mr. R. M. Eagle was "general manager of the entire plant," including both the sawmill and the railroad.

Saxon was superintendent of the sawmill. Abe Johnson, a negro, was temporary section foreman of the railroad. Saxon was repairing the furnace at the sawmill on the day that he received the injuries. The mill was not in operation that day. He needed some shovels for use in this work. There were two shovels in the toolhouse of the railroad department. Mr. Eagle, the general manager, testified:

"I then held the position of superintendent of the Saner-Ragley Lumber Company, and as superintendent of that company my duties are general manager of the entire plant. * * * Mr. Saxon was cut by Abe Johnson shortly after 7 o'clock on Monday morning, April 4, 1921. At the' time he was under the sawmill on the ground floor of the sawmill. As to what his duties were at the time, and as to what he was engaged in at that time—he was engaged in mill repairing; the sawmill was closed down. At that time he was at and about his usual place of work, and at that time he was engaged in the usual and customary duties of his position as foreman of the mill. * * *

---

⚖═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

This attack that was made on Mr. Saxon by Johnson was under the sawmill, and that was at the place Mr. Saxon had usually worked, and where he had authority and jurisdiction. * * * This Abe Johnson, foreman railroad gang, kept the tools in a small—what I would call a section house or toolhouse about, probably, 1,200 feet from the mill in a west direction on the railroad track. * * * These shovels in question were kept at that place. * * * That toolhouse is situated on the railroad right of way of the company, along the track; there is really no right of way; it is all owned by the company; it is on the track. * * * Abe Johnson, the foreman of the railroad division, would go to work from 6:30 o'clock to 7 o'clock; that is when they usually start. The mill was not in operation that day; it was shut down for repairs. This furnace work and brick work and mortar work in which the shovels were used by Saxon was work done in repairing the furnaces while the mill was shut down. * * * The mill foreman was Mr. Saxon; called him superintendent; in that division he was superintendent; that is, of the manufacturing division, making of the lumber at the mill, and in making repairs at the mill, and doing things incident to the manufacturing of lumber. * * * It was the business of Johnson to look after the tools and supply his men with shovels. * * * Mr. Saxon knew whose shovels they were, and where they came from, and all about it. * * * I sent a man off to get those shovels. I gave him these instructions to go and get those shovels, and take them to Mr. Saxon. I told him to get them from the toolhouse out of the railroad department. I told him he probably would have to get them from Mr. Byrnes, but I learned afterwards he did not. He knew the toolhouse was unlocked and he went up there and brought them down. * * * Mr. Saxon had these two shovels under my directions and at my instructions, and doing the work that I had required him to do as superintendent of the mill."

Charlie Stanford testified:

"On the 4th day of April, 1921, I was down there at Ragley. I was somewhere about the sawmill. I will just tell the court where I was. Well, I went down to the planer and they were not going to run that day, and I went on to the mill and asked Mr. Saxon could I drive a clean-up wagon that morning. He said stay around here two or three minutes, and he would see whether that other fellow came out or not, and we went on around behind the engine room behind him, and about that time—well, old Abe Johnson, a negro, walked up, and Mr. Saxon said, 'What you have, Preacher?' He said, 'I want to get them three shovels that you got.' And Mr. Saxon said, 'We need them to-day;' says, 'We are making up this cement stuff here,' and old Abe said, 'Well, I have got to have them all too.' They turned and went around under the mill, and that is all I heard them say then. And then old Abe said, 'Yip! Yip!' and I turned around there, and he had his knife in his hand something like this way (witness indicating), walking up to Mr. Saxon, and Mr. Saxon was walking off from him. That is about all I seen."

265 S.W.—10

Mr. Eagle testified:

"About 7:10 a. m., on Monday morning, April 4, 1921, I was walking from the office to the mill, when within about approximately 30 feet I heard loud voices underneath the mill, and on approaching a little closer I saw Mr. Saxon and this negro. Mr. Saxon had recognized me about the same time. He said to the negro: 'Here comes the boss, or superintendent;' I do not recall which word he used, 'Here comes the boss, or the superintendent; he can settle this.'"

It is provided in the statute (General Laws, 35th Legislature, Regular Session, p. 292 [Vernon's Ann. Civ. St. Supp. art. 5246—82]) that:

"The term 'injury sustained in the course of employment' * * * shall not include: * * *

"(2) An injury caused by an act of a third person intended to injure the employé because of reasons personal to him and not directed against him as an employé, or because of his employment."

It is plaintiff in error's contention that the injuries from which Saxon died "were caused by an act of Johnson intended to injure Saxon, because of reasons personal to him and not directed against him as an employee, or because of his employment."

Because of Saxon's employment, Mr. Eagle had the shovels carried to him. Because Saxon had the shovels in use in the company's business, Johnson came to the mill. Because Saxon needed the shovels in the company's business, he did not deliver them to Johnson. The evidence leads to the inference that the failure of Saxon to deliver the shovels caused the injuries to be inflicted. The failure to deliver them was not for reasons personal, but for a reason in furtherance of the employer's business. But for the employer's business, it may be inferred from the evidence Saxon would have delivered the shovels to Johnson and no difficulty would have arisen and no injuries would have been inflicted. These conclusions are reasonable inferences from the evidence. No reasons personal to Saxon—no reasons separable from his adherence to the interests of his employer—are shown by the evidence to have caused Johnson to inflict the injuries. No motives, other than Saxon's pursuance of his employer's business, are assignable, under the evidence, for Johnson's acts. It is not contended that Saxon's injuries are any other of the injuries which section 1 of part 4 of the Workmen's Compensation Law, supra, provides "the term 'injury sustained in the course of employment'" shall not include. Therefore, since Saxon's injuries were not caused by an act of a third person, because of reasons personal to Saxon, those injuries were sustained in the course of his employment. It is provided by said section 1 of

part 4 of the Workmen's Compensation Law, after exceptions 1, 2, 3, and 4, that the—

"term 'injury sustained in the course of employment' * * * shall include all other injuries of every kind and character having to do with and originating in the work, business, trade or profession of the employer, received by an employé while engaged in or about the furtherance of the affairs or business of his employer whether upon the employer's premises or elsewhere."

No other of those exceptions than No. 2 is urged as covering the injuries in this case. We have held above that the injuries did not fall within exception No. 2. Under the decisions of our courts there is no questioning that Saxon's injuries were sustained in the course of his employment. Lumbermen's Reciprocal Association v. Behnken, 112 Tex. 103, 246 S. W. 72; Kirby Lumber Company v. Scurlock, 112 Tex. 115, 246 S. W. 76; Western Indemnity Co. v. Leonard (Tex. Com. App.) 248 S. W. 655. Likewise, under the decisions of the courts of other states, Saxon's injuries were sustained in the course of his employment. It is not necessary to discuss the decisions of the courts of other jurisdictions interpreting the "term 'injury sustained in the course of employment.'" We merely refer to an annotation on the subject of injuries "arising out of and in the course of" the employment, within the meaning of the Workmen's Compensation statutes, contained in L. R. A. 1918F, pp. 896–918. Not only were the injuries sustained in the course of Saxon's employment, but they originated in the business.

Plaintiff in error's second contention is that the trial court erred in decreeing a lump-sum payment. The contention is grounded upon the assertion that there was no evidence that this was a "special" case or that "hardship or injustice would otherwise result." It also claims that, because the matter of a lump-sum settlement was not presented to the Industrial Accident Board the court was without power to compel the association to redeem its liability by a lump-sum payment.

[2] Weekly payments are provided in the act out of regard for the beneficiaries themselves, and not out of regard for the association or insurance companies. The provision for weekly payments was inserted, because such payments were, in the judgment of the Legislature, for the best interests of those to whom compensation was provided—to prevent squandering and waste. A "special" case is not necessarily determinable by the relative poverty of the claimant. The thrift, intelligence, foresight, habit of frugality, capacity to manage and keep the money of the given claimant, might as well make his a special case as direst poverty. The statute undertakes to leave it to the judgment of the court or jury as to what constitutes a special case. In such consideration the jury or court is not confined to a consideration of the paucity or profuseness of the claimant's earning capacity or income. Weekly payments might work the greatest "hardship or injustice" to the claimant having the greatest capacity because there might be, and probably would be, joined with that capacity ability and power to conserve and use beneficially and profitably the whole sum of the association's liability. Commutation to lump sums have been made in order to enable the employee to invest his compensation in a business of his own (Kelly v. Snare & Triest Construction Company, 1 Cal. I. A. C. Dec. 471); to return to his native land (Olsen v. Western Fuel Co., 2 Cal. I. A. C. Dec. 643); to discharge a mortgage on the dependent's home (State Comp. Ins. Fund of the State of Cal. v. Jacobsen, 1 Cal. I. A. C. Dec. 311); and also where the employer was about to wind up its business and leave the state (Decounter v. United Greenwater Copper Co., 2 Cal. I. A. C. Dec. 700). Honnold on Workmen's Compensation, pp. 656–658, and citations there shown.

[3] At any rate, the lump sum is discounted and only its present value is paid when a lump sum is allowed. Hence no hardship is worked on the insurance company or association by such a settlement. Its only contention justly to be made would be that a proper discount had not been made. Aside from these observations, we think the decree for a lump sum is sustained by the evidence, on the ground of necessity. We do not burden the record with the evidence again, as it is set out in the opinion of the Court of Civil Appeals in this case, cited above.

[4] On the proposition that the district court was not authorized to decree the lump-sum settlement because such settlement had not been presented to and passed upon by the Industrial Accident Board, we have to say that the Workmen's Compensation Act, supra, provides that, when either the association or the employer shall bring suit to set aside the decision of the Board, the trial shall be de novo (page 284); that "the court shall in either event determine the issues in such cause instead of the board," and that "whenever such suit is brought the rights and liabilities of the parties thereto shall be determined by the provisions of this act." In fact, the Industrial Accident Board is not a court, but only an administrative board. Therefore an "appeal" from its decisions is not an appeal from one court to another. But, on a trial de novo, were the Industrial Accident Board a court, the parties occupy the same position and are governed by the same rules as to pleadings and amendments as in the court a quo. The only test as to the right to file any pleading or amendment in a trial de novo is, Would it have been admitted in the cause if it should have been commenced originally in the district

court? Newton v. Newton, 61 Tex. 511; McLane v. Paschal, 62 Tex. 102. Aside from this, the question has been decided by our Supreme Court. Lumbermen's Reciprocal Association v. Behnken, supra. In that case, Justice Greenwood speaking for the court, said:

"After the claim of defendants in error was denied by the Industrial Accident Board, the district court had jurisdiction to determine all issues between the parties, regardless of whether defendants in error's right to lump-sum compensation had been asserted before the Board. In so holding, the Court of Civil Appeals followed the plain letter and intent of the statute."

In that case, the Industrial Accident Board denied all claim. In this case, the Industrial Accident Board allowed the weekly payments, but we think this difference does not alter the jurisdiction or right of the court to determine the question of a lump-sum settlement though it had not been presented to the Board.

[5] Plaintiff in error next and finally contends that:

"The Court of Civil Appeals erred in holding that the defendants in error are entitled to interest at the rate of 6 per cent. per annum on the 'present value' of the total compensation from the date of the death of the deceased, that is, April 8, 1921, to the date of the judgment of the Court of Civil Appeals, entered on February 8, 1923, because the present value did not become a liquidated, interest-bearing amount until the trial court, in performing the substituted functions of the Accident Board, determined that a lump sum should be paid, and this determination was not made until the trial of this case. It was upon the trial of the case in the lower court when the discount of 5 per cent. should have been allowed, and it was then that the interest on the 'present value' should have commenced to run, not when the accident occurred or when the potential right to compensation arose."

Section 8 of the Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp. 1918, art. 5246—14) cited above, reads:

"If death should result from the injury, the association hereinafter created shall pay the legal beneficiaries of the deceased employé a weekly payment equal to 60 per cent. of his average weekly wages, but not more than $15 nor less than $5 a week, for a period of 360 weeks from the date of the injury."

This is a simple declaration of what the association shall do if death results from the injury in a manner within the terms and meaning of the statute. It created a liability upon the association immediately upon the death of the employee for payment according to the terms of the statute and a right in the beneficiary or beneficiaries to that payment. The liability of the association is of the nature of a debt, and the right of the beneficiary is that of a creditor in that debt. Moore v. Lumbermen's Reciprocal Association (Tex. Com. App.) 258 S. W. 1051. The liability is as definitely fixed as to amount, time, and binding force as if the association had executed its notes due for the payments prescribed. The association has the right under the statute to contest the matter of those payments before the Board and in the courts. If it can show that the injury or death does not come within the law, it escapes all payment and all liability for all payment; but when it contests such payments, and the courts decide that the injury or death comes within the provisions of the law, the judgment relates, by the force of the statute, to the time prescribed by the statute, the date of the injury, just as a judgment on a contested note, when liability on such note is fixed thereby, relates to the maturity date of the note. Interest in the one case is due from the date of the maturity of each unpaid payment on the sum due, and in the other case, interest, either statutory or contractual, is due from the date of the maturity of the note on the amount thereof if proper pleadings have been filed as they were in this case. From April 4, 1921, the date of the injuries, to June 1, 1922, is 60 weeks. Therefore, interest at the rate of 6 per cent. per annum was due defendants in error on the 60 unpaid installments from the maturity of each to the date of the trial court's judgment. When the remaining installments, each of which was a liability of the association and a vested right in the beneficiaries, subject to the terms of the law providing for compensation in a lump sum, were so commuted, each should have been discounted to its present value at the date of the judgment, and the sum of these present values, plus the amount, including principal and interest, of the 60 deferred weekly installments to the date of the judgment, is the sum for which judgment should have been rendered. There is no objection by either party to the rate of interest or to the rate of discount. Therefore we shall calculate the interest at the rate of 6 per cent. and the present worth at the date of the judgment at the rate of 5 per cent.

One of the weekly unpaid installments of $15 bore interest for 59 weeks, one for 58 weeks, and one for 57 weeks, and so on, each for one week less than the other up to the first payment due before the judgment, which payment bore no interest because it had just become due. The sum of the series, 59, 58, 57, etc., to 1, inclusive, which is 1,770, is the total sum of weeks for which $15 bore interest. The interest on $15 for that time at 6 per cent. is $30.63. This is the interest on the 60 weekly payments due and unpaid at the date of the judgment.

Since 60 payments were due and unpaid at the date of the judgment and since originally there were 360 weekly payments, there were 300 payments not due at the date of the judgment. To arrive at the sum of the pres-

ent values of these 300 weekly payments, it is readily seen that one $15 payment, the one last due, must be discounted for 300 weeks, the next for 259 weeks, etc., on down to one week, the first payment after the judgment. The sum of the present worth of all these payments is the amount that should be allowed in a lump sum in lieu of, and as an equivalent of, the 300 weekly payments maturing after the judgment. That sum is $3,952.12. Since the Board had awarded the $15 weekly payments, the award held until set aside by judgment of the court. All due under that award—60 payments of $15 each —must be paid by the association. Those 60 payments equal $900. As shown above, the interest on these 60 payments at the date of judgment was $30.63. The amount, therefore, of the 60 payments, principal and interest, is $930.63. This, plus the present value of the 300 weekly payments, which is shown above to be $3,952.12, makes $4,882.-75, for which judgment should have been rendered by the trial court, together with interest thereon at the rate of 6 per cent. until paid.

Therefore we recommend that the judgments of the trial court and the Court of Civil Appeals be reversed, and that judgment be here rendered in favor of defendants in error for the sum of $4,882.75, and for interest thereon at the rate of 6 per cent. from the date of the judgment of the trial court, June 1, 1922, until paid—one-half thereof in favor of Ada Saxon and one-tenth thereof in favor of each of the other defendants in error.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals both reversed, and judgment rendered for defendants in error for $4,882.75, with 6 per cent. per annum interest from June 1, 1922, as recommended by the Commission of Appeals.